## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| PAUL KISHORE KONDAVEETI, Administrator of the Estate of MANISHA NUKAVARAPU, Deceased, | No. |
| *Plaintiff,* | |
| v. | |
| THE BOEING COMPANY, a corporation, | |
| *Defendant.* | |

## COMPLAINT

Plaintiff, Paul Kishore Kondaveeti, Administrator of the Estate of Manisha Nukavarapu, deceased, on behalf of the Decedent, her estate and her survivors, files this Complaint at Law by the undersigned counsel and against defendant The Boeing Company ("Boeing") as follows:

## INTRODUCTION

1.      This wrongful death and survival action for money damages arises out of the March 10, 2019 crash ("subject crash") of Ethiopian Airlines flight 302, Boeing 737 (MAX), ET-AVJ (the "subject aircraft"), which took off from Addis Ababa Bole Int. Airport bound to Nairobi, Kenya Jomo Kenyatta Int. Airport (the "subject flight"), killing all 157 passengers on board, including Plaintiff's Decedent.

2.      The subject crash occurred because, *inter alia*, Boeing defectively designed a new flight control system for the Boeing 737 MAX 8 which, without pilot command, automatically and erroneously forces the aircraft into a dangerous and uncontrollable nose down attitude and dive. Inexcusably, there was a failure to warn and properly train relating to this design defect as

1

well.[1] As will be discussed in this Complaint, Defendant Boeing's conduct was outrageous and was the direct cause of this disaster, which otherwise would not have occurred had there been compliance with basic principles of safe aircraft design and pilot training.

## JURISDICTION AND VENUE

3.     The Plaintiff Administrator is a citizen of the United States and a resident of Missouri, residing at 1632 Strecker Ridge Court, Ellisville, MO 63011.

4.     Plaintiff's Decedent, pictured below, was from Andhra Pradesh, a citizen of India, and a lawful United States-based resident of Tennessee at times relevant hereto. At the time of the subject crash, Dr. Nukavarapu was employed at East Tennessee State University as a second-year medical resident internal medicine physician. At the time of the subject crash, Dr. Nukavarapu was flying to Nairobi, Kenya to visit her sister, who had recently delivered three baby boys.



5.     Boeing is and has, at all relevant times, been a citizen and resident of the State of

---

[1] The Plaintiff also intends to assert claims against the United States Federal Aviation Administration ("FAA") under the Federal Tort Claims Act, 28 U.S.C. § 2674 in compliance with 28 U.S.C. § 2675. The Plaintiff's claims against the FAA arise out of the agency's negligence in improperly certifying the 737 MAX 8.

Illinois because it maintains its principal place of business in Illinois. At all relevant times, Boeing has been authorized to do business, and has been transacting or conducting substantial business activity in the State of Illinois. *See* 735 Ill. Comp. Stat. 5/2-209(b)(4).

6.     Venue is proper in Cook County, Illinois, because Boeing resides in Cook County. Boeing has an office in Cook County and has, at all relevant times, conducted business there.

7.     Because more than 75 persons died at the same location as a result of the subject crash, this action is governed by the Multi-Forum Multi-Jurisdiction Act, 28 U.S.C. §1369, and this Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

## THE PARTIES

8.     At all times relevant hereto, the Plaintiff's Administrator is a citizen of the United States and a resident of the state of Missouri.

9.     At all relevant times, Plaintiff's Decedent, Manisha Nukavarapu, was a 28 year old citizen of India and a lawful resident of Tennessee residing at 1184 Mountain View Road, Johnson City, Washington County, Tennessee.

10.     Plaintiff's Decedent was not married and did not have children. At the time of her suffering and death due to the subject crash, she had been studying to become an endocrinologist.

11.     The Defendant, Boeing is a corporation that is domiciled and has its principal place of business in Cook County, Illinois at all times relevant hereto.

12.     At all relevant times, Boeing was engaged in the business of designing, manufacturing, integrating, assembling, modifying, maintaining, inspecting, testing, servicing, marketing, advertising, and distributing aircrafts and their component parts, including the subject aircraft.

## FACTUAL BACKGROUND

13.     Prior to the subject crash, defendant Boeing designed, manufactured, assembled,

3

and sold the subject aircraft and its component parts and prepared and provided an Aircraft Flight Manual (the "AFM") for the subject aircraft in the United States.

14.     The United States Federal Aviation Administration (the "FAA") approved the design of the 737 MAX 8 model aircraft.

15.     The FAA improperly and substantially delegated to Boeing authority to approve the system safety analysis relating to the subject aircraft.

16.     At all relevant times, Boeing falsely represented that the subject aircraft is airworthy, safe, reliable, and fit for its intended purposes.

17.     On or about November 15, 2018, Boeing delivered the newly manufactured subject aircraft to Ethiopian Airlines in Indonesia with full awareness that it would be used by said airline for commercial operations carrying hundreds of passengers such as during the subject flight.

18.     Boeing's 737 MAX is the top-selling model with over three hundred 737 MAX 8's registered around the world and utilized by major U.S. airlines, including with limitation Southwest and American, and also used by Air Canada.

19.     The subject aircraft, sold and delivered by Boeing without alteration or substantial change by another party, was being used by Ethiopian Airlines as an intended user in a manner reasonably foreseeable to Boeing.

20.     The Boeing 737 MAX 8 differs from previous aircraft models as it was designed to have more powerful engines to compete in the market with the European Airbus commercial aircraft.

21.     With the more powerful engine, the flight characteristics of the subject aircraft were sufficiently different from other 737 models, thus otherwise requiring extensive pilot training and a new pilot type-rating would have been required for the subject aircraft.

22.     Notwithstanding the foregoing, Boeing had sold the aircraft with the understanding

that the original 737 type-rating would improperly allow the pilot to fly the new model.

23.     More specifically, the more powerful engine is heavier, and when placed on the subject aircraft, altered its aerodynamic balance and flight characteristics. As an example, with the application of thrust, the aircraft was more susceptible to a higher pitch configuration, thereby increasing the risk of an excessive Angle of Attack ("AoA") in a climb and creating a greater risk for stalling and crashing the aircraft.

24.     Angle of Attack ("AoA") is the angle at which the wing of an aircraft meets the air or the Relative Wind. When the airframe of an aircraft stalls, or loses its ability to maintain safe flight control, it is caused by an excessive angle of attack.

25.     Understanding and appreciating scenarios where the Angle of Attack is excessive or is otherwise approaching an increased risk of stall in a given flight configuration is one of the most fundamental aspects of proper flight control and pilot safety.

26.     Boeing sought to address this dangerous development on the 737 MAX 8 by designing and installing an automatic flight control system called MCAS, i.e., the Maneuvering Characteristics Augmentation System. The MCAS system was supposed to properly stabilize the aircraft in flight configurations as referenced in this Complaint; unfortunately, this flight control system was inexcusably and unreasonably dangerous.

27.     More specifically, the MCAS flight control feature would command a significant and unauthorized and dangerous nose down movement of the aircraft when it perceived an abnormality associated with AoA, whether or not that abnormality *actually* existed. The automatic, and un-commanded, nose down movement was done without notification to the flight crew.

28.     Boeing did not provide proper notification to pilots regarding when the MCAS was operating and active on the 737 MAX and the subject aircraft. It did not warn pilots that in certain

circumstances it might cause the airplane to precariously pitch down, or automatically force the airplane into a cycle of recurring and powerful dives. In addition, Boeing did not provide pilots with sufficient information about how to immediately and properly respond to an MCAS that is forcing unwarranted and/or repeated dives that can lead to tremendous air loads on the flight controls that preclude safe recovery.

29.     The MCAS system receives data from a device on the front aspect of the fuselage called an AoA sensor, as illustrated in the diagram below.



**How Maneuvering Characteristics Augmentation System (MCAS) works**

The anti-stall system was introduced due to the heavier engines on the 737 MAX 8

*Level flight*

Airflow

**Normal flight attitude**
Sensor winglet aligns with airflow

**Nose-up attitude**
At too slow a speed, a higher-than-normal attitude can put the aircraft into a stall. In such a case, if the angle of attack rises too high, the MCAS activates by moving the stabilizer to push down the aircraft's nose.

*Nose-up angle*     Airflow

*Horizontal stabilizer*     *Angle of attack device: Indicates difference between aircraft alignment and flight path*

SOURCE Florida Institute of Technology; Boeing; FAA; USA TODAY research

30.     If the AoA sensor detects what it believes is an abnormality associated with one of the AoA sensors, the MCAS automatically adjusts the plane's horizontal stabilizer or tail section to move up, thereby causing the nose to pitch down to prevent what it perceives to be an imminent airframe stall.

31.     However, instead of utilizing *multiple* safety sensors, the 737 MAX 8 relies upon only *one* of the AoA sensors; therefore, if the AoA sensor provides incorrect or contradictory data

6

to the MCAS, the system will automatically force the aircraft into an unwarranted and forceful dive in a hazardous failure mode.

32. Forcing an aircraft into an unwarranted dive, especially at low altitudes in a take-off scenario, is incredibly dangerous because pilots typically do not have enough time to properly and safely address the problem.

33. Early in the certification of the 737 MAX, the FAA safety engineering team divided up the technical assessments that would be delegated to Boeing, which eventually included the "System Safety Analysis" of the MCAS, because of the competition with the European Airbus and pressure to put the American aircraft on the market.

34. In addition, by designing this automatic flight control computer system, Boeing falsely led the airline aircraft purchasers into believing that pilots did not need to fully understand the MCAS, and only required minimal or no training in transitioning to the subject aircraft, as an enticing cost savings measure.

35. More specifically, there was a lack of proper training in high-speed nose low recovery with excessive air loads on the flight controls.

36. Boeing's original System Safety Analysis intentionally and grossly misrepresented and downplayed the power and danger of the MCAS, as well as the degree the tail moved up and nose pitched down, when the MCAS was automatically activated.

37. Boeing's System Safety Analysis also failed to account for the fact that the MCAS can be triggered multiple times, thereby increasing the power of the MCAS each time to send the aircraft into an unrecoverable dive with excessive air loads on the flight controls.

38. In addition, as referenced above, Boeing's "System Safety Analysis" failed to identify the inherent flaw in its system by only relying upon *one* AoA sensor system to determine whether circumstances required activation as a cost-saving measure for Boeing.

7

39.    Boeing also did not equip the subject aircraft, as standard safety equipment, with a comparative AoA indicator that would alert the flight crew of a discrepancy between the two AoA sensors in a given flight configuration.

40.    Boeing also did not equip the subject aircraft, as standard safety equipment, with an AoA indicator that would prominently display the readings of the both AoA sensors.

41.    Boeing was clearly on notice of these inexcusable dangers described above secondary to pilot reports to federal authorities about the inherent dangers associated with the "Safety System" of the Boeing 737 MAX 8 and moreover, as a result of the recent crash of Lion Air flight 610 in Indonesia, which is substantially similar to the subject crash.

42.    More specifically, on October 29, 2018, an Indonesian Boeing 737 MAX 8 (Flight 610) crashed into the sea shortly after take-off from the country's capital Jakarta, killing all 189 people on board. Following the crash, the FAA issued an Emergency Airworthiness Directive (AD) 2018-23-51 that identified the "unsafe condition . . . likely to exist or develop" in the subject aircraft. Unfortunately, the subject aircraft was not grounded, which is unjustifiable.

43.    Accordingly, on March 10, 2019, at 05:38 UTC, the subject aircraft took off from Addis Ababa Bole Int. Airport bound to Nairobi, Kenya Jomo Kenyatta Int. Airport.

44.    On the date of the subject crash, the aircraft possessed a certificate of airworthiness.

45.    The pilot and flight crew obtained the license and qualifications to conduct the flight and there were no adverse weather conditions affecting the flight.

46.    Shortly after takeoff, the AoA sensor recorded an erroneous value and the left stick shaker activated and remained active until near the end of the flight.  The "stick shaker" rapidly and noisily vibrates the control yoke when the aircraft systems sense what it believes is an ensuing airframe stall situation.

8

47.     In addition, the airspeed and altitude values from the left air data system began deviating from the corresponding right-side values.

48.     One of the subject's AoA sensors falsely indicated that the plane's nose was pointed too high and there was an automatic aircraft nose down, which was trimmed several times by the MCAS system. There was no comparative AoA indicator that was on this aircraft to alert the pilots to any discrepancy between sensors.

49.     The pilot(s) on the subject aircraft followed the protocol that had been made known to them as best as reasonably possible under these emergent circumstances.

50.     Due to flight control problems as referenced in this Complaint, the pilot(s) were unable to maintain an adequate and safe flight path and requested to return to the departure airport.

51.     As a direct result of the repetitive and forceful un-commanded and unauthorized aircraft nose down conditions, and the other deficiencies summarized in this Complaint, the subject aircraft crashed at 5:44 UTC 28 miles southeast of Addis Ababa, killing all passengers on board, including Plaintiff's Decedent, and destroying the aircraft.

52.     Defendant Boeing had recklessly violated a fundamental principle of air safety by designing the flight control system of the subject aircraft with a single-point failure mode that would foreseeably trigger a series of events that would cause a loss of pilot control and end in a crash.

53.     Upon field inspection, there was no evidence of any non-containment event (engine components ejected out of the side of the engine), or any other anomalies with either engine that would have interfered with normal operation.

54.     At the time the subject aircraft left the custody and control of Boeing and entered the market, by and through the actions or omissions of Boeing, the subject aircraft was defective in design, lacked standard safety equipment, had inadequate warnings, and was unreasonably

dangerous in the following ways, *inter alia*:

    a.  the subject aircraft's automated flight control system on the 737 MAX series forces the aircraft to dive down automatically toward the ground in situations where such dives are unwarranted, unreasonably dangerous, and erroneous;

    b.  the subject aircraft's electrical and computer components erroneously and automatically force the nose of the airplane down, forcing it to dive, even when the aircraft is being flown manually by pilots;

    c.  the subject aircraft's flight control system incorrectly and automatically operates the aircraft in such a way as to cause excessive nose-down inputs and significant altitude loss—a catastrophic condition when it occurred on flight 302;

    d.  the subject aircraft's automatic MCAS flight control system dangerously and defectively allowed the stabilizer to get very far out of trim causing excessive and uncontrollable air loads to occur, which prevented successful manual trimming to allow for safe recovery;

    e.  the subject aircraft's sensors are defective and generate false readings, including false readings related to the aircraft's AoA—the angle between the wing and the oncoming airflow—which triggers the aircraft's automated flight management and control systems to push the aircraft's nose downward;

    f.  the subject aircraft's lack of standard safety equipment, including a comparative AoA indicator, that would indicate discrepancy between sensors in a given flight configuration causes it to be unreasonably dangerous;

    g.  the subject aircraft's defective sensors and flight control system cause the aircraft's control yoke to feel different from the yokes used for training the users of the 737 series, which cause the subject aircraft's pilots to be confused and unable to correct the subject aircraft's automatic dive;

    h.  the subject aircraft's lack of redundancies in its sensors renders it unreasonably dangerous because minor inputs and minor errors can force the aircraft into an uncontrollable nosedive;

    i.  Boeing's lack of warnings to the airlines, pilots, users, and intended third-party consumers of the defective automation that causes the subject aircraft to dive;

    j.  Boeing's lack of training to users, including potential manual overrides to the subject aircraft's defective system and a lack of training in high-speed nose low recovery; and

    k.  Boeing's lack of incorporating the material changes to its previous 737 models with sufficient testing and data; and

l.  Boeing's failure to properly and adequately test the subject aircraft, its flight control system, and its sensors.

## COUNT I
## STRICT PRODUCTS LIABILITY

55.     The preceding paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

56.     At all relevant times, the subject aircraft was sold and delivered by Boeing without being altered by some other party and without material change in the condition in which it was sold and delivered, and it was being used as intended by, or in a manner that was reasonably foreseeable to, Boeing.

57.     The subject aircraft was unreasonably dangerous as designed. At the time of its manufacture, the likelihood that the subject aircraft would cause serious bodily injury or death to passengers aboard the subject aircraft, including Plaintiff's Decedent, and the magnitude of harm and risk of death and serious bodily injury clearly outweighed the burden and cost on Boeing in designing the subject aircraft in a way that would have prevented the harm, including standard safety equipment, and providing adequate warnings of such defects.

58.     Boeing's defects in the design and lack of warnings of the subject aircraft caused the subject crash, which directly, proximately, and foreseeably caused the pre-impact injury, fear of impending and imminent death, conscious suffering, and ultimate death of Plaintiff's Decedent.

59.     The Plaintiff claims all damages available under the applicable law, including pre-impact conscious pain and suffering, fear of impending and imminent death, ultimate death, lost earnings and earning capacity, funeral and/or burial expenses, and/or related medical expenses in an amount according to proof at trial.

60.     The Plaintiff claims all damages available to the Estate, the survivors, and the

11

beneficiaries under the applicable law, including those pecuniary losses, loss of companionship, loss of guidance, loss of consortium, loss of advice, loss of society, and damages associated with grief, sorrow, and mental suffering, as well as pain and suffering and emotional distress.

61.　Based on the foregoing, Boeing acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious, and/or reckless disregard for the rights and/or safety of others, such that Plaintiff requests that the trier of fact award Plaintiff additional damages sufficient to punish Boeing for its outrageous and deplorable conduct in an amount reasonably related to Plaintiff's actual damages and Boeing's financial condition for the purpose of deterring Boeing and others similarly situated from engaging in similar conduct in the future.

## COUNT II
## NEGLIGENCE – PRODUCTS LIABILITY

62.　The preceding paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

63.　At all relevant times, Boeing owed a duty to use reasonable care, and to exercise the highest degree of care, in planning, designing, certifying, manufacturing, assembling, installing, overhauling, modifying, repairing, testing, inspecting, marketing, advertising, and distributing its aircraft, including the subject aircraft and its component parts, so as to not cause serious bodily injury to, or the death of, the subject aircraft's passengers, including Plaintiff's Decedent.

64.　Boeing negligently breached the duty of care it owed to the Plaintiff and the Plaintiff's Decedent by negligently, carelessly, and recklessly designing the subject aircraft with unreasonably dangerous defects, by designing an unreasonably dangerous product that failed to perform in a manner reasonably to be expected based upon its nature and intended function, and by placing the subject aircraft into the market with unreasonably dangerous design defects.

12

65.     Boeing's defects in the design and lack of warnings of the subject aircraft caused the subject crash, which directly, proximately, and foreseeably caused the pre-impact injury, fear of impending and imminent death, conscious suffering, and ultimate death of Plaintiff's Decedent.

66.     The Plaintiff claims all damages available under the applicable law, including pre-impact conscious pain and suffering, fear of impending and imminent death, ultimate death, lost earnings and earning capacity, funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

67.     The Plaintiff claims all damages available to the Estate, the survivors, and the beneficiaries under the applicable law, including those pecuniary losses, loss of companionship, loss of guidance, loss of consortium, loss of advice, loss of society, and damages associated with grief, sorrow, and mental suffering, as well as pain and suffering and emotional distress.

68.     Based on the foregoing, Boeing acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious, and/or reckless disregard for the rights and/or safety of others, such that Plaintiff requests that the trier of fact award Plaintiff additional damages sufficient to punish Boeing for its outrageous and deplorable conduct in an amount reasonably related to Plaintiff's actual damages and Boeing's financial condition for the purpose of deterring Boeing and others similarly situated from engaging in similar conduct in the future.

## COUNT III
## BREACH OF WARRANTY

69.     The preceding paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

70.     Boeing was the designer, manufacturer, distributor, and/or seller of the subject aircraft, and/or its component parts, involved in the subject crash.

71.     Prior to the subject crash, Boeing expressly and/or impliedly warranted and

represented that the subject aircraft and its component parts was airworthy, of merchantable quality, both fit and safe for the purpose of commercial air travel for which it was designed, intended, and used, and free from all defect. The subject aircraft and its component parts were in substantially similar material condition at delivery to Ethiopian Airlines.

72.     Plaintiff's Decedent, as one of the passengers on the subject aircraft and flight, was an intended third-party consumer of Boeing's warranties that the subject aircraft was airworthy, of merchantable quality, both fit and safe for the purpose of commercial air travel for which it was designed, intended, and used, and free from all defects.

73.     Plaintiff's Decedent reasonably relied upon said warranties of safety to her detriment, suffering and death.

74.     Boeing's breach of express and/or implied warranties of the subject aircraft caused the subject crash, which directly, proximately, and foreseeably caused the pre-impact injury, fear of impending and imminent death, conscious suffering, and ultimate death of Plaintiff's Decedent.

75.     The Plaintiff claims all damages available under the applicable law, including pre-impact conscious pain and suffering, fear of impending and imminent death, ultimate death, lost earnings and earning capacity, funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

76.     The Plaintiff claims all damages available to the Estate, the survivors, and the beneficiaries under the applicable law, including those pecuniary losses, loss of companionship, loss of guidance, loss of consortium, loss of advice, loss of society, and damages associated with grief, sorrow, and mental suffering, as well as pain and suffering and emotional distress.

77.     Based on the foregoing, Boeing acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious, and/or reckless disregard for the rights and/or safety of others, such that Plaintiff requests that the trier of fact award Plaintiff additional damages

14

sufficient to punish Boeing for its outrageous and deplorable conduct in an amount reasonably related to Plaintiff's actual damages and Boeing's financial condition for the purpose of deterring Boeing and others similarly situated from engaging in similar conduct in the future.

## COUNT IV
## FAILURE TO WARN

78.     The preceding paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

79.     At all relevant times, Boeing negligently failed to warn the public and passengers, the airlines, the pilots, the users, and the intended third-party consumers of the 737 MAX 8's unreasonably dangerous and defective design, including that the aircraft would un-commanded and uncontrollably dive because of erroneous sensors.

80.     At all relevant times, Boeing had knowledge that the subject aircraft was defective, dangerous, unsafe, and not airworthy and had knowledge of the unreasonably safe design of the AoA sensor and automated MCAS, as well as the magnitude of risk for serious bodily injury and death if those systems were to fail.

81.     Ordinary consumers, including pilots, flight attendants, and passengers, would not have recognized the potential risks presented by the subject aircraft's unreasonably dangerous and defective design.

82.     Boeing's defects in the design and lack of warnings of the subject aircraft caused the subject crash, which directly, proximately, and foreseeably caused the pre-impact injury, fear of impending and imminent death, conscious suffering, and ultimate death of Plaintiff's Decedent.

83.     The Plaintiff claims all damages available under the applicable law, including pre-impact conscious pain and suffering, fear of impending and imminent death, ultimate death, lost earnings and earning capacity, funeral and/or burial expenses, and/or related medical expenses in

an amount according to proof at trial.

84.     The Plaintiff claims all damages available to the Estate, the survivors, and the beneficiaries under the applicable law, including those pecuniary losses, loss of companionship, loss of guidance, loss of consortium, loss of advice, loss of society, and damages associated with grief, sorrow, and mental suffering, as well as pain and suffering and emotional distress.

85.     Based on the foregoing, Boeing acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious and/or reckless disregard for the rights and/or safety of others, such that Plaintiff requests that the trier of fact award Plaintiff additional damages sufficient to punish Boeing for its outrageous and deplorable conduct in an amount reasonably related to Plaintiff's actual damages and Boeing's financial condition for the purpose of deterring Boeing and others similarly situated from engaging in similar conduct in the future.  Boeing intentionally turned a blind eye to the inherent dangers of the subject aircraft and purposely choose not to warn domestic and international airlines, pilots, passengers and the world wide community at large of the insidious defects associated with this aircraft.

## COUNT V
## CIVIL CONSPIRACY

86.     The preceding paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

87.     Boeing conspired with and consented to a scheme, device, plan, and agreement with other entities and individuals, including the FAA and/or personnel delegated authority by the FAA, to certify the Boeing 737 MAX series in violation of the laws and regulations of the United States for the purpose of speeding up the approval process of the Boeing 737 MAX series, which in turn gave Boeing a financial and competitive advantage in the aviation industry.

88.     Boeing and these other entities and individuals engaged in concerted actions to

deceive, deny, and/or downplay the hazards and safety concerns, in violation of federal regulations, presented by the Boeing 737 MAX 8's new features, including its MCAS, heavier and repositioned engines, and unstable aerodynamics.

89.     Boeing committed tortious and/or unlawful actions in furtherance of the conspiracy, including by failing to correctly classify the safety concerns presented by the MCAS; by failing to adhere to industry standards and regulations in designing and testing the 737 MAX; by failing to recuse itself from the certification process when it knew or should have known that it was acting under extreme financial pressure to certify the 737 MAX as soon as possible; and by applying pressure, whether directly or indirectly, to the Boeing personnel that had been delegated regulatory authority to certify the 737 MAX without appropriate testing and data, and without adequate time to properly and adequately complete the testing.

90.     As a direct and proximate result of this conspiracy, Plaintiff's Decedent has suffered pre-impact injury, fear of impending and imminent death, conscious suffering, and ultimate death of Plaintiff's Decedent.

91.     The Plaintiff claims all damages available under the applicable law, including pre-impact conscious pain and suffering, fear of impending and imminent death, ultimate death, lost earnings and earning capacity, funeral and/or burial expenses, and/or related medical expenses in an amount according to proof at trial.

92.     The Plaintiff claims all damages available to the Estate, the survivors, and the beneficiaries under the applicable law, including those pecuniary losses, loss of companionship, loss of guidance, loss of consortium, loss of advice, loss of society, and damages associated with grief, sorrow, and mental suffering, as well as pain and suffering and emotional distress.

93.     Based on the foregoing, Boeing acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious, and/or reckless disregard for the rights and/or safety of

17

others, such that Plaintiff requests that the trier of fact award Plaintiff additional damages sufficient to punish Boeing for its outrageous and deplorable conduct in an amount reasonably related to Plaintiff's actual damages and Boeing's financial condition for the purpose of deterring Boeing and others similarly situated from engaging in similar conduct in the future.

## COUNT VI
## PUNITIVE DAMAGES

94.    The preceding paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

95.    Strong equitable reasons justify the allowance of punitive damages in this unique catastrophic case that has a direct bearing on safe air travel and public safety at large in the United States and worldwide.

96.    The Multi-Forum Multi- Jurisdiction Act 28 U.S.C. §1369 is governed by a choice of law analysis for substantive law on liability and damages, and punitive damages are permitted under Tennessee law, the state of Plaintiff's decedent domicile pursuant to § 29-39-104 - Punitive damages, 2014 Tennessee Code.

97.    Boeing had knowledge its subject aircraft was going to be used for its intended purpose, i.e., carrying hundreds of passengers by air to a destination domestically in the USA and internationally.

98.    Boeing had knowledge of the magnitude of risk of serious bodily harm, fear of impending death, and death if there was a design defect and/or a failure to warn about a design defect that could cause the aircraft to automatically dive down without pilot input.

99.    In designing, manufacturing, assembling and selling the accident aircraft with the defects set forth in Counts I through V above and in performing or failing to perform the acts set

18

forth said counts, defendant Boeing acted willfully, wantonly, recklessly, and with an intentional or conscious disregard for the safety of Plaintiff's Decedent and the other 156 decedents on the subject aircraft.

100.    Specifically, defendant Boeing had actual knowledge of these perilous defects as summarized in this Complaint, and the alarming findings of the substantially similar Lion Air Flight 610 crash and subsequent FAA Airworthiness Directive. Instead, Boeing consciously and intentionally turned a blind eye and determined it would not ground the subject aircraft and promptly correct these life-threatening hazards.  Furthermore, Boeing refused to promptly warn the airlines, pilots, passengers and the domestic and international public at large relating to the ominous risks associated with the subject aircraft.

101.    Defendant Boeing also had actual and/or constructive knowledge of the fact that the flight crews of the subject flight did not know of any means or methods to correct the improperly-commanded downward movement, and how to immediately regain safe control of the subject aircraft due to a lack of complete and proper training and instruction.

102.    Regardless of claims relating to actual notice, at a minimum, Boeing had constructive knowledge that the design of its MCAS system was inherently flawed and inexcusably and unreasonably dangerous, consistent with the allegations summarized in this Complaint.  Boeing awareness of the inherent dangers associated with the MCAS system had become fully manifested after the

103.    As the direct and proximate result of one or more of the above-described willful, wanton, reckless, intentional, or conscious acts or omissions of defendant Boeing, one or more of the sensors on the accident aircraft failed and provided erroneous information to the accident aircraft's flight control system as to the accident aircraft's AOA; the flight control system of the accident aircraft failed to filter out this erroneous information and commanded the accident

aircraft to go into a dangerous downward dive; there was no means or method for the flight crew to safely manually override the improperly-commanded downward movement; the flight crew had not been instructed and advised as to any means or method to correct the improperly-commanded downward movement and could not regain control of the accident aircraft; and the aircraft crashed, killing all those onboard, including Plaintiff's Decedent.

104.   As a further direct and proximate result of one or more of the aforesaid willful, wanton, reckless, intentional, or conscious acts and omissions of defendant Boeing which resulted in the crash of the accident aircraft, Plaintiff's Decedent was caused to suffer a multitude of injuries both a personal and pecuniary nature, inclusive of conscious pain and suffering, and severe terror and fear of impeding death prior to impact and prior to her death.

105.   The aforesaid willful, wanton, reckless, intentional, or conscious acts and omissions of defendant Boeing which resulted in the crash of the accident aircraft warrant and justify an award of punitive damages in an amount to punish defendant Boeing for its conduct and to deter future such conduct from Boeing and others.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Boeing as follows:

    a.  General damages in amount according to proof at trial, and well beyond the jurisdictional minimum of this Court;

    b.  Economic and property losses;

    c.  Conscious physical pain and suffering;

    d.  Pre-impact injury, including fear of impending and imminent death by mutilation;

    e.  Delayed death;

    f.  Past mental anguish;

    g.  Past physical disfigurement;

h. Past medical expenses;

i. Past lost wages and future earning capacity;

j. Past and future loss of enjoyment of life and life's pleasures;

k. Funeral expenses, burial expenses, estate administration expenses;

l. Loss of contribution to family, society, comfort, companionship, services, emotional pain, and anguish;

m. Loss of care, guidance, and tutelage;

n. For interest upon any judgment entered as provided by law;

o. For all costs of suit incurred herein;

p. For such other and further relief as this Court may deem just and proper; and

q. Punitive damages in an amount according to proof.

## JURY TRIAL

Plaintiff demands a trial by jury as to all claims in this action.

Dated: April 17, 2019

Respectfully Submitted,

/s/ Joseph A. Power, Jr.
Joseph A. Power
James I. Power
Jonathan Thomas
**POWER ROGERS & SMITH, L.L.P.**
70 W. Madison Street
Suite 5500
Chicago, IL 60602
312-236-9381
joepower@prslaw.com
jamespower@prslaw.com
jthomas@prslaw.com

21

Andrew J. Stern (to be admitted *Pro Hoc Vice*)
Pa. Bar. No. 46510
Elizabeth A. Crawford ((to be admitted *Pro Hoc Vice*)
Pa. Bar. No. 313702
**KLINE & SPECTER, P.C.**
1525 Locust Street
Philadelphia, PA 19102
(215)772-1000/Fax (215) 735-0958
andy.stern@klinespecter.com
elizabeth.crawford@klinespecter.com


R. Wayne Culbertson, Esq. (to be admitted *Pro Hoc Vice*)
Suresh Nekuri, MD, JD, MBA (to be admitted *Pro Hoc Vice*)
**R. WAYNE CULBERTSON, P.C.**
119 West Market
Kingsport, TN 37660
(423)247-6161